**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ENVIRONMENTAL BARRIER COMPANY, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 06 C 0212 |
| ) | |
| SLURRY SYSTEMS, INC., ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

In this action, Plaintiff Environmental Barrier Company, LLC ("EBC") seeks confirmation of an arbitration award that it won in a construction contract dispute with Slurry Systems, Inc. ("SSI"). The arbitrator, Judge Franklin Kral, determined that SSI, the prime contractor in an environmental construction project, owed $388,919.88 plus arbitration costs to EBC, the successor in interest to a subcontractor on that project. For the reasons that follow, the court grants EBC's motion and confirms the arbitration award.

## BACKGROUND

**A.   The Subcontract**

On February 29, 2000 the U.S. Army Corps of Engineers ("COE" or "Owner") contracted with SSI ("Contractor") for work on the Chicago Underflow Plan McCook Reservoir Overburden Groundwater Cut-Off Wall, a project that involved the construction of a multi-billion gallon reservoir, intended to reduce flooding during heavy rains. SSI was tasked to construct the overburden cutoff wall, one of several major components of the overall project. SSI, in turn, subcontracted part of the project to Geo-Con, Inc. ("Geo-Con" or "Subcontractor"). Under the subcontract, Geo-Con was responsible primarily for removing sludge and constructing the cutoff wall. As is explained below, EBC, the party seeking confirmation of the award, was not a party to this contract.

SSI entered into a Standard Form of Agreement with Geo-Con on April 21, 2000 (the

"Agreement"). The Agreement provided, inter alia, that "Any claim arising out of or related to this Subcontract" shall be subject to arbitration. (Standard Form of Agreement Between Contractor and Subcontractor, Ex. 2 to Brief in Support of Motion to Vacate or, in the Alternative, to Modify Arbitration (hereinafter "Agreement"), Article 6.2.1.) The contract defined the scope of the work Geo-Con was to perform for each part of the project. In addition to responsibilities for other aspects of the project, Geo-Con was responsible for 62.4% of the costs associated with the construction of the cutoff wall, the most expensive part of the project. In total, based on the original scope of the project, Geo-Con was to contribute 58% of all direct project costs.[1] (Award at 2.)

In relation to payment, the contract provided that Geo-Con would recover its expenses and would share in the profit (or loss) that SSI earned on the project: "Total Subcontractor Sum will be equal to the total subcontractor's direct costs as defined below plus 58% of the total net profit of the Prime Contract. In the case of a total net loss of the Prime Contract, the total Subcontractor Sum will be equal to the total subcontractor's direct costs less 58% of the total net loss of the Prime Contract." (Agreement, Attachment A, Article 10.1.) The parties were to provide invoices to each other and keep records of their itemized direct costs on a weekly basis. In case the original project grew in cost and/or size, the contract provided: "Towards the end of the project, based on the actual distribution of direct costs, some adjustments may be required for the final few progress payments to correct for final Subcontract Sum." (*Id.*)

The scope of the project did in fact increase significantly due to the need for rock chiseling to key the slurry wall into competent bedrock. (Award at 5.) Geo-Con was unable to reach an appropriate depth for the project using the initial construction methods, and the project was delayed while the COE decided how to proceed. Later, the COE approved a demonstration section to evaluate an alternative method, and eventually approved the construction of a rock "keyway" to

---

[1] Direct cost refers to the cost associated with performance.

secure the cutoff wall. According to SSI, Geo-Con bid $8.49 per square foot to perform the necessary chiseling work. (Memorandum in Opposition to EBC's Motion to Confirm Arbitration Award, at 5.) Throughout the project, SSI submitted payment requests to the COE, referred to as "draws," and the COE paid the draws intermittently. In total, SSI received more than $10,500,000 from the COE. (Award at 3-4.) As contemplated by the Agreement, representatives of SSI and of Geo-Con met regularly to track costs, and SSI made progress payments from its draws to Geo-Con, to cover costs and profits. After work had been completed and a final inspection was made, the last such meeting occurred on April 14 and 15, 2003. (*Id.* at 5.) Because there were several change orders pending at the time of that final meeting, the parties were unable to reach a final settlement. (*Id.*) The change orders shifted each party's contribution to the total project cost: Under the original Agreement, Geo-Con was responsible for approximately 58% of the direct costs (and apparently entitled to 58% of the profits), but the change orders reduced Geo-Con's proportion of direct costs significantly. (*Id.* at 3-5.)

**B.    Geo-Con's Bankruptcy**

On September 30, 2003, Geo-Con filed a voluntary petition for reorganization in the United States Bankruptcy Court for the Southern District of New York. At the time of filing, Geo-Con believed SSI owed it at least $711,335, the precise amount being dependent on the settling of change orders which had not yet been processed by the COE. (*Id.* at 4-5.) This figure was based on the initial profit allocation for the entire project of 58%.[2]

On April 16, 2004, Judge Adlai Hardin of the New York Bankruptcy Court authorized EBC to assume Geo-Con's subcontract with SSI (the "Order"). (*In re Castlton Excavating, Inc., Invatech Inc., Geo-Con Inc.,* No. 03-B-23649, -23650, -23652 (Bankr. S.D.N.Y. April 16, 2004), Ex. 30, in

---

[2]    There is no indication in this record that Geo-Con's bankruptcy filing was a function of difficulties in recovering payment from SSI on the McCook project.

Support of Brief in Opposition to EBC's Motion to Confirm Arbitration Award (hereinafter "Order").) On April 29, pursuant to the bankruptcy court's Order, EBC and Geo-Con executed a Bill of Sale that provided: "Seller [Geo-Con] does hereby sell, transfer, assign and vest in Buyer [EBC], its successors and assigns forever, all of its right, title and interest in and to all assets of Seller, free and clear of all liens, claims and encumbrances . . . ." (Bill of Sale from Geo-Con to EBC, Ex. 32 to Brief in Opposition to EBC's Motion to Confirm Arbitration Award (hereinafter "Bill of Sale"). The McCook project was listed as one of several "accounts receivable and contracts to be assumed" by EBC. (*Id.*) Schedule D to the Bill of Sale further stated that all contracts for services were specifically excluded from the sale, but went on to list a number of contracts for services not excluded from the sale. That list includes project P90099, the contract for work at McCook. The court concludes, therefore, that both the account receivable and the contract for service itself were transferred to EBC as part of this assignment.

By letter dated June 17, 2004, EBC demanded payment from SSI for the $711,335 account receivable that EBC had purchased from Geo-Con. SSI refused, and after a failed attempt at mediation, on April 20, 2005, EBC filed a Demand for Arbitration with the American Arbitration Association ("AAA"), seeking an award for the remaining balance due under the Subcontract. On August 23 and 24, 2005, Franklin Kral, the AAA arbitrator, conducted a two day hearing and, on November 21, 2005, he issued an award in favor of EBC. In this action, EBC seeks confirmation of Judge Kral's award and SSI asks the court to vacate it.

## DISCUSSION

In a case seeking confirmation of an arbitral award, the court's role is confined: "Judicial review of arbitration awards is tightly limited; perhaps it ought not be called 'review' at all. By including an arbitration clause in their contract the parties agree to submit disputes arising out of the contract to a nonjudicial forum, and we do not allow the disappointed party to bring his dispute into court by the back door, arguing that he is entitled to appellate review of the arbitrators'

4

decision." *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 706 (7th Cir. 1994) (citations omitted). Arbitration is favored by the courts, and an award within the scope of the arbitration agreement is presumptively enforced. "If the district judge is satisfied that the arbitrators resolved the entire dispute and can figure out what that resolution is, he must confirm the award." *IDS Life Ins. Co. v. Royal Alliance Assocs., Inc.*, 266 F.3d 645, 650-51 (7th Cir. 2001). Review of arbitration decisions is deferential, and "neither error nor clear error nor even gross error is a ground for vacating an award." *Id.* at 650 (collecting cases).

EBC now asks this court to enforce the Award. EBC argues that under the deferential standard of review given to arbitration decisions, the award should be confirmed because the arbitrator interpreted the original Agreement and decided the entire matter before him. SSI disagrees, and asks this court to vacate the award for several reasons. First, SSI observes that the arbitration agreement existed only between the original signing parties, SSI and Geo-Con; accordingly, SSI contends that EBC, a third party, has no rights under that agreement. And even if an agreement to arbitrate existed, SSI argues that EBC was in default of the contract, and thus lacked standing to invoke the arbitration clause. SSI next argues that the arbitrator did not interpret the contract, but instead, in giving an award which neither party specifically requested, ruled on a matter not submitted by either party. Third, SSI urges that the award is not enforceable because EBC comes before the court with Geo-Con's "unclean hands"; specifically, according to SSI, Geo-Con made false representations regarding the amount due to the Bankruptcy Court, SSI, and SSI's bonding company. Finally, in the alternative to vacating the award, SSI asks this court to modify the interest awarded EBC, and to offset the award by the amount owed for three backhoe buckets it claims Geo-Con took from the job site. The court addresses these objections in turn.

### A. Agreement to Arbitrate

SSI argues, first, that the arbitrator exceeded his powers by entering an award in favor of EBC, who was not a party to the original Agreement. Further, SSI contends, even if EBC were a party to the Agreement, it lacks standing to invoke the arbitration clause because it was in default of the contract.

Although procedural matters, including standing, are for the arbitrator to decide, SSI is correct that the first issue—whether an agreement to arbitrate existed between the parties—is one for the court. *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546-47 (1964); *CUNA Mut. Ins. Soc'y v. Office & Prof'l Employees Int'l Union, Local 39*, 443 F.3d 556, 563-64(7th Cir. 2006); *Chicago Typographical Union v. Sun Times*, 860 F.2d 1420, 1424 (7th Cir. 1988). EBC was not a party to the original arbitration agreement; it was signed four years before EBC purchased the account receivable during Geo-Con's bankruptcy proceedings. The Agreement did address the matter of assignment, but made no specific reference to the assignment of Geo-Con's right and duty to arbitrate; instead, the Agreement provides only that "The Subcontractor [Geo-Con] *shall not assign the Work* of this Subcontract without the written consent of the Contractor [SSI], nor subcontract the whole of this Subcontract without the written consent of the Contractor, nor further subcontract portions of this Subcontract without written notification to the Contractor when such notification is requested by the Contractor." (Agreement, Article 7.4.2) (emphasis added). The assignment at issue here is not related to the work of the subcontract, but instead to the ability of EBC to seek recovery of money allegedly due under the contract. There was no assignment of the work Geo-Con agreed to perform for SSI. As the arbitrator stated in his decision, "the project work [was] completed in early 2003." (Award at 7.) The terms of the Agreement thus do not bar the assignment of Geo-Con's right to seek arbitration of a dispute concerning payment. Nor, as SSI argues, did Geo-Con and EBC require SSI's consent to any transfer; the contract makes clear that such consent is required for transferring the work only.

Neither party has presented the court with any authority on the issue of whether a party who is the successor to a party to an arbitration agreement can enforce the arbitration agreement. Absent any contrary authority, the court is satisfied that the right to arbitrate transferred to EBC when it executed the Bill of Sale and purchased the account receivable from Geo-Con during Geo-Con's bankruptcy proceedings. *See, e.g., Oxford Commercial Funding v. Cargill, Inc.*, No. 00-C-4996, 2002 WL 31455989, *3 (N.D. Ill. Oct. 31, 2002) ("In cases addressing the assignment of accounts receivables, courts have held that the assignee 'stands in the shoes of the assignor' and is 'subject to contract defenses or claims of the account debtor arising by virtue of the terms of the contract out of which the receivable was created.'") (citation omitted); *Laborers Int'l Union of N. America v. HSA Contractors, Inc.*, 728 F. Supp. 519, 524 n.3 (E.D. Wis. 1989) (noting that courts have found contract assignees, though nonparties to an arbitration agreement, to be bound by such an agreement) (citing *Fisser v. Int'l Bank*, 282 F.2d 231, 233 n.6 (2d Cir. 1960)). EBC received all "rights" from Geo-Con, and the Agreement provided no bar to transferring the right to arbitrate. Thus, this court concludes that EBC had the right to enforce SSI's agreement to arbitrate.

SSI's remaining objection to EBC's standing to enforce the arbitration clause relates to EBC's alleged breach of other contract provisions. In its Order, the Bankruptcy Court stated that "the Purchaser is directed to make such cure payments as are required by Section 365 of the Code and agreed to among the Debtors and respective contracting parties." (Order ¶ 3.) Relying on this language, SSI argues that EBC lacks standing to invoke the arbitration clause of the contract because EBC assumed the contract in its entirety but never "cured all defaults" as required by the Order, and thus was in breach of the contract. Specifically, SSI alleges that Geo-Con failed to provide it with lien waivers related to remaining progress payments, and that Geo-Con failed to maintain insurance in the required amount. Under the Bankruptcy Code, a trustee may terminate an executory contract, 11 U.S.C. § 365, and the case law explains that a contract remains "executory" for purposes of this provision unless one party to the contract has no further substantial

obligations. *In re Kmart Corp.*, 290 B.R. 614, 617 (N.D. Ill. 2003). The Seventh Circuit has approved an understanding of an executory contract in the bankruptcy context as one in which the bankrupt and the other party are both obligated, where their obligations remain unperformed on both sides and failure of either party to complete performance would constitute a material breach, excusing the performance of the other. *See Gouveia v. Tazbir*, 37 F. 3d 295, 298-99 (7th Cir. 1994). SSI suggests that EBC's alleged breach of the obligation to furnish lien waivers and maintain insurance in the required amount was a material breach that excuses SSI's obligation to arbitrate.

This matter was addressed by the arbitrator. During arbitration, SSI counterclaimed that EBC, by its assumption of the Subcontract, was in breach of the contract's non-monetary terms. The arbitrator found no indication the contract was ever even identified as an executory contract under 11 U.S.C. § 365. (Award at 7.) "There has been no evidence that the Bankruptcy Trustee either assumed or rejected this Subcontract, as required in Section 365 (a), that would identify this as an executory contract." (*Id.*) And, "[t]here has been no evidence that SSI ever declared and notified GEO that it was in default of its contractual obligations as required in Subcontract Article 3.3. SSI is denied its prayer for a declaration that EBC, by its assumption of the GEO Subcontract, is in breach of the contract non-monetary terms." (*Id.*). The issue of procedural standing is one for the arbitrator, not the court. *See Chicago Typographical Union*, 860 F.2d at 1424. The arbitrator's conclusion on this issue is thus subject to deferential review, which it easily survives. SSI's standing objections are overruled.

**B.    Arbitrator's Interpretation of the Contract**

SSI argues that even if it is bound by the agreement to arbitrate, the court may not enforce the award because the arbitrator exceeded his authority by inserting into the contract his "own notions of what is reasonable and fair." *Shearson Lehman Bros., Inc. v. Hedrich*, 266 Ill. App. 3d 24, 28-29, 639 N.E.2d 228, 232 (1st Dist. 1994) (quoting *Hill v. Norfolk & Western Ry. Co.*, 814 F.2d

1992, 1995 (7th Cir. 1987)). In *Shearson*, the contract provided employees with either five percent or eleven percent interest on outstanding deferred income depending on whether the income was "unvested" or "vested." *Id.* The arbitration panel chose not to utilize either interest rate in calculating an award to former employees under an employer's deferred compensation plan. *Id.* The court vacated the decision, finding that the "arbitrators exceeded their authority in awarding defendants an amount which was clearly not based upon the precise and unambiguous mathematical formulas provided in the deferred compensation agreements." *Id.* Such an interpretation was not a "reasonably possible one." *Id.* (quoting *Rauh v. Rockford Prods. Corp.*, 143 Ill. 2d 377, 391-392, 574 N.E.2d 636, 643 (1991)).

SSI argues that Arbitrator Kral similarly exceeded his authority by awarding an amount not identified in the contract in an attempt to "split the difference." The analogy is not convincing. Arbitrator Kral observed that the under the original Agreement between SSI and Geo-Con, the apportionment of profits was based on "each party's price contribution to the entire lump sum Prime Contract Price: percentages of .423756 for SSI and .5762439 for GEO, rounded to 42% and 58%." (Award at 2.) But as the project progressed, it expanded significantly, and the parties' price contributions shifted as well. The Agreement contemplated some adjustments, stating that "based on the actual distribution of direct costs, some adjustments may be required for the final few progress payments to correct for final Subcontract Sum." (Agreement, Attachment A, Article 10.1). The arbitrator plausibly interpreted this language to mean that if each party's price contribution changed, then its share of the profits should as well. The arbitrator found that, in the end, SSI bore 56.02% of the costs, and that EBC bore 43.98%. (Award at 4.) He rounded these numbers to 56% and 44% respectively, and apportioned profits based on this sharing of costs. (*Id.*)

Relying on *Shearson*, SSI asserts that because the award of $355,456.71 was almost exactly the difference between EBC's alleged receivable of $711,335 and SSI's claim that nothing was owed, the arbitration decision should be vacated. In *Shearson*, however, the court did not

9

vacate the award simply because it fell between the amounts the two parties claimed was owed; it was vacated because it was "clearly not based upon the precise and unambiguous mathematical formulas" in the compensation agreement. *Shearson,* 266 Ill. App. 3d at 29, 639 N.E.2d at 232. No such precise formulation is set forth here; instead, the contract language here which provided that "some adjustments may be required" was ambiguous because it was "reasonably or fairly susceptible to more than one interpretation," especially given the increased costs associated with the project. *Perkins Restaurants Operating Co., L.P. v. Van Den Bergh Foods Co.*, 276 Ill. App. 3d 305, 310, 657 N.E.2d 1085, 1089 (1st Dist. 1995) (citation omitted).

SSI draws further support for its argument from several cases, but the court concludes none are controlling in this case. In *Roadmaster Corp. v. Production and Maint. Employees' Local 504*, 851 F.2d 886, 889 (7th Cir. 1988), the Seventh Circuit affirmed an order vacating an arbitral award where the arbitrator based his decision, not on the contract between the parties, but on his own view of the law. In that case, the arbitrator found that because the employer violated the National Labor Relations Act in providing notice to the union that it intended to terminate the collective bargaining agreement, the contract must extend another year. *Id.* at 888-89. In vacating the decision, the Seventh Circuit found that the "arbitrator clearly went beyond considering the contract's terms" when he considered "outside 'positive law'" and was "plainly wrong." *Id.* at 889. "When a contract, such as the one involved here, specifically limits an arbitrator's subject matter jurisdiction, the arbitrator should restrict his consideration to the contract, even if such a decision conflicts with federal statutory law." *Id.*

In the case before this court, SSI offers no example of the arbitrator's making a decision based upon "positive law" (even where it appears that may be the case) rather than upon the Agreement. This court declines to read *Roadmaster* to support the proposition that the arbitrator is limited to deciding between amounts already laid out in the contract, a term SSI uses to refer to the figure of 58% of the profit (or loss) from the project. On this record, the court is comfortable in

concluding that the arbitrator confined his analysis to the terms of the contract.

Nor does *187 Concourse Assocs. v. Fishman*, 399 F.3d 524 (2d Cir. 2005) support SSI's challenge to the award. In that case, the union argued that an employee fired after two altercations with his supervisors was discharged without cause, in violation of the collective bargaining agreement. *Id.* at 526. The arbitrator was called upon to decide whether the employee was discharged for cause, and if not, what the appropriate remedy should be under the agreement. *Id.* The arbitrator concluded that the "[e]mployer had no option but to terminate the [employee]," but then found that "he should be given an opportunity to prove he can be a productive employee." *Id.*(quoting the arbitrator's decision). In affirming the district court's decision to vacate the award, the Second Circuit observed that "having found just cause for the termination, the arbitrator had no authority to fashion an alternative remedy." *Id.* "By the terms of the submission, therefore, the arbitrator had authority to proceed to the second question only if he found no just cause for [plaintiff's] termination." *Id.* at 527. The *187 Concourse Assoc.* decision recognizes that any relief an arbitrator may grant must be consistent with the arbitrator's specific findings. Nothing about that holding requires the court to vacate the arbitration at issue here.

Citing *Sears, Roebuck and Co. v. Teamsters Local Union No. 243*, 683 F.2d 154, 155 (6th Cir. 1982), SSI correctly observes that an arbitrator "lacks authority to disregard or modify plain or unambiguous contract provisions." In *Sears*, the Union sought arbitration after Sears subcontracted certain work and eliminated ninety jobs. *Id.* The arbitrator rejected the Union's argument that the collective bargaining agreement prohibited such extensive subcontracting, but concluded that the costs of the subcontracting to the Union outweighed the benefits to the employer. *Id.* He therefore ordered reinstatement of the workers and an award of back pay. *Id.* The Sixth Circuit concluded that the arbitrator had exceeded his authority, as the plain language of the collective bargaining agreement authorized no such balancing test, and affirmed the lower court's decision vacating the arbitration decision. *Id.* at 156. Nothing about what Arbitrator Kral did here suggests any disregard

of the plain language of the Agreement.

Nor is the court persuaded by SSI's argument that the arbitrator acted improperly because he attempted to determine what the parties would have negotiated at a final meeting. The case law establishes that such an effort is not improper: "[T]he arbitrator may decide what the parties would have intended with respect to a particular issue not addressed by them, so long as 'the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement.'" *Illinois Tool Works, Inc. v. Coltec Indus., Inc.*, 31 F. Supp. 2d 1044, 1048 (N.D. Ill. 1998) (quoting *Ethyl Corp. v. United Steelworkers of America*, 768 F.2d 180, 186 (7th Cir. 1985) (citation omitted)) (internal quotation omitted). The arbitrator here attempted to derive a general framework of intent based on the initial cost and profit allocations of the parties. In doing so, he did not disregard any unambiguous language or modify terms of the contract, as in *Sears*.

As EBC points out in its motion to confirm, when courts review arbitration awards, the question is only whether the arbitrators interpreted the contracts. "If they did, their interpretation is conclusive." *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1195 (7th Cir. 1987); *see also Ethyl Corp.*, 768 F.2d at 184 ("[S]o long as the award is based on the arbitrator's interpretation–unsound though it may be–of the contract, it draws its essence from the contract."). This court is satisfied that the arbitrator was doing no more in this case than attempting to interpret the contract. Accordingly, his interpretation is conclusive.

SSI next argues that the arbitrator exceeded his powers by rendering an award on a matter not submitted by either party. According to SSI, the arbitration agreement limited the arbitrator's authority to deciding only whether EBC was correct in its interpretation that it was entitled to a strict 58% of profits. For support, SSI again turns to authority outside this circuit. First, in *Totem Marine Tug & Barge, Inc. v. N. American Towing, Inc.*, 607 F.2d 649, 649 (5th Cir. 1979), the plaintiff had contracted with defendant for the use of a vessel for six-month period, but due to problems with the vessel, terminated the agreement several months early. The vessel owner sought arbitration of the

12

resulting dispute, seeking to recover the cost of retrieving the vessel. *Id.* The arbitration panel awarded the vessel owner the unpaid contract price, an amount three times greater than the vessel owner had demanded. *Id.* at 651. Reversing the district court order enforcing that award, the Fifth Circuit vacated the award because the arbitration panel awarded "an unrequested item of damages three times larger than any item claimed" by the party receiving the award. *Id.* By ignoring the arbitral dispute submitted, the court concluded, the arbitrators had dispensed their "'own brand of industrial justice.'" *Id.* at 652 (quoting *United Steelworkers of America v. Enter. Wheel and Car Corp.*, 363 U.S. 593, 597 (1960)).

Again, the case before this court is distinguishable. EBC claimed SSI owed $711,355 and the arbitrator used this number in determining the final award, which was substantially smaller than the initial amount requested. SSI points out that EBC sought recovery of the full 58% of the contract price, without any reductions, and argues that the arbitrator entered an award on a claim that was not submitted to him when he made a determination about what the parties would have negotiated at a final meeting. As explained earlier, however, the arbitrator enjoys some flexibility in crafting a resolution of the parties' dispute, so long as that resolution draws its essence from the contract. SSI has presented no reasonable argument, and this court can find none, to suggest that the award should be vacated because it was "driven by a desire to do justice beyond the limits of the contract." *Ethyl Corp.*, 768 F.2d at 187. SSI's view also ignores the presumption that the arbitrator "considered and fully determined all matters submitted to him." *7-Eleven, Inc. v. Dar*, 325 Ill. App. 3d 399, 410, 757 N.E.2d 515, 524 (1st Dist. 2001). Indeed, here it is fair to conclude that the arbitrator did decide whether EBC was entitled to a strict 58% of the profit: he decided this was incorrect, and that adjustments should be made to reflect the final apportionment of project costs. This is not a basis for vacating the award, and the court declines to do so.

**C.    Unclean Hands**

SSI also attacks the award on the ground that EBC comes before the court with "unclean

13

hands." EBC argues this is not relevant, because this Circuit has made clear that "[t]he grounds on which the plaintiffs can attack the award are limited to those set forth in the Federal Arbitration Act." *IDS Life Ins. Co.*, 266 F.3d at 649-50 (holding that the award was valid, even though it denied relief to both sides on inconsistent grounds, because it did not leave any portion of the dispute unresolved); *see also Wise v. Wachovia Securities, LLC,* 450 F.3d 265, 268-69 (7th Cir. 2006) (refusing to disturb an arbitral award on the non-statutory ground that it was in "manifest disregard of the law"; such a defense is confined to circumstances in which the arbitrator has directed the parties to violate the law). At least some authority suggests, however, that while the defense of unclean hands "may not fall within grounds for vacating the arbitration," it may still be a defense "to plaintiff's suit for enforcement." *Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, No. 00-C-6703, 2001 WL 322005, *4 (N.D. Ill. Apr. 2, 2001). Although the "unclean hands" defense is not identified in 9 U.S.C. § 9 as a basis on which a party may attack an arbitral award, the court will presume that it is an available defense.

Assuming that "unclear hands" is a defense to enforcement, the court concludes it is not a sufficient basis for the court to deny EBC's motion in this case. SSI characterizes the amount EBC seeks to collect as a "fabricated asset." Specifically, according to SSI, Geo-Con kept two sets of books during the construction project. Only one of those books reflected actual invoices to SSI. The other set of books, containing Geo-Con's internal invoices, was "simply false," says SSI, because Geo-Con artificially inflated the amount due as security for bank loans by pledging accounts purportedly for "work in progress." In response, EBC claims that the amounts set forth in this second set of books were based on the assumption that more money would be received for the project when unresolved change orders were approved. SSI notes that it was Mr. Brian Jasperse, who was president of Geo-Con during the project until his termination on February 10,

2003[3], who bought the alleged account receivable from the bankruptcy court on behalf of EBC. EBC responds by observing that LaSalle Bank reinstated Mr. Jasperse as president of Geo-Con after the bankruptcy filing. Moreover, it was LaSalle Bank, the bank to whom SSI claims Geo-Con made a fraudulent account, that later financed Mr. Jasperse's acquisition of Geo-Con's assets.

      SSI had an opportunity to present both of these arguments to Arbitrator Kral, and did so. The matter of Geo-Con's duel accounting books was one of SSI's primary defenses during the hearing, and an entire section of its closing argument. Among other things, SSI presented evidence that Geo-Con recorded in its own invoices—which were not disclosed to SSI as part of the process of tracking costs during the project—that Geo-Con was entitled to various amounts owed per square foot of chiseling; all quotes in Geo-Con's own invoices were higher than Geo-Con's initial bid of $8.49 per square foot. SSI argued to the arbitrator that Geo-Con pledged the alleged inflated "account receivable" to La Salle bank to secure loans. And SSI provided the arbitrator with depositions to verify that certain change orders, which Geo-Con claimed authorized the inflated price, did not exist, and that SSI never had access to Geo-Con's internal invoices containing the inflated price quotes. Although, as SSI points out, the arbitrator made no mention of this defense in the final decision, this court must still presume the arbitrator considered it. *7-Eleven, Inc.,* 757 N.E.2d at 524, 325 Ill. App. 3d at 410. Moreover, the arbitrator made "further adjustments" to the $711,355 claimed receivable "*to reduce it by the amounts actually received from the COE*, job costs, job profits to date and the fractional percentage calculation of profit sharing of 44% to GEO and 56% to SSI." (Award at 7) (emphasis added). So even if SSI is correct in its assertion that Geo-Con was pledging an artificially inflated amount owed to secure bank loans, it appears the arbitrator made sure that the final award reflected the true account receivable. The alleged misconduct, by Geo-Con, if any, should not bar EBC from collecting an award that appears to

---

[3]     Mr. Jasperse was reinstated as President of Geo-Con on October 27, 2003.

15

discount any artificially inflated claims that EBC purchased in the bankruptcy sale.

**D.     Modification of Award**

In the alternative to vacating the award, SSI has asked this court to modify it for two reasons: (1) the arbitrator awarded interest starting on April 15, 2003, but SSI did not receive final payment until sometime after June 23, 2005; and (2) the arbitrator overlooked SSI's alleged offsets that were either uncontested or agreed to.

    **1.     "Pay-When-Paid" Clause**

SSI contends that the award should be modified because interest can run no sooner than the date it received its final payment from the COE. But this argument runs against the plain language of the contract, which specifically provides for progress payments: "The Contractor shall pay the Subcontractor each progress payment within three working days after the Contractor receives payment from the Owner." (Agreement, Article 11.3.) Such a clause is referred to as a "pay when paid" clause, and Illinois courts have recognized the validity of such a provision. *Preload, Inc. v. Marino Const. Co.*, No. 91-C-999, -998, 1991 WL 202651, *4 (N.D. Ill. Sept. 30, 1991) (citing *A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp.,* 132 Ill. App. 3d 325, 477 N.E.2d 30 (1st Dist. 1985)). Pursuant to Article 15.2 of the contract, the arbitrator awarded EBC contract interest on the amounts receivable from SSI. The interest the arbitrator awarded is based on payment dates by the COE to Geo-Con. (Award at 5.) Accordingly, this court declines to modify the award on this ground.

    **2.     SSI's Alleged Offsets**

Finally, SSI seeks to modify the award to take into account the cost of three reinforced backhoe buckets SSI purchased in September 2002. SSI claims that Geo-Con took the buckets when it left the project site at the end of 2002. But as EBC points out, this is really a claim against Geo-Con. The Bill of Sale by which EBC acquired Geo-Con's assets states:

> [A]ll persons holding Liens or Claims with respect to the assets to be acquired under

the Offer . . . or arising out of, under or in connection with, or in any way related to, events occurring prior to the Closing Date are forever barred, estopped and permanently enjoined from asserting such Liens or Claims against Purchaser . . . .

(Order ¶ 9.) It also provided, "[t]he transfer of the Assets from the Debtors to the Purchaser does not and will not subject Purchaser to any liability for claims . . .against the Debtor . . . ." (Order ¶ 12.) SSI's claim was one properly brought against the debtor (Geo-Con) during its bankruptcy proceeding.

As EBC observes, the purpose of the "free and clear of claims" language in the Bankruptcy Court's Order is to permit an assignee to acquire an asset without being subject to pre-petition unsecured claims associated with that asset. Otherwise, "who would ever purchase assets at a bankruptcy proceeding if the successor liability were not limited, despite the plain wording of the bankruptcy order?" *Myers v. United States*, 297 B.R. 774, 781 (S.D. Cal. 2003); *see also Action Mfg. Co. v. Simon Wrecking Co.*, 387 F. Supp. 2d 439, 446 (E.D. Pa. 2005) (stating that the "traditional common law rule on successor liability holds as a general rule that a purchaser of assets does not succeed to the seller's liabilities"[4]) (citing *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 308 (3d Cir. 1985)). This court agrees with the court in *Myers*. SSI may have had a valid claim against Geo-Con for the backhoe buckets, but such a claim is not part of this proceeding.

## **CONCLUSION**

For the reasons set forth herein, EBC's motion to confirm (7) is granted and SSI's motion to vacate or modify the award (10) is denied**.**

ENTER:

*[signature: Rebecca R. Pallmeyer]*

---

[4] There are four exceptions to non-liability: a purchaser of assets will succeed to the seller's liabilities where "(1) the purchaser of assets expressly or impliedly agrees to assume the obligations of the transferor; (2) the transaction amounts to a consolidation or *de facto* merger; (3) the purchasing corporation is a mere continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability." *Action Mfg. Co.*, 387 F. Supp. 2d at 446 (citation omitted). No exception is applicable here.

Dated: September 29, 2006

_____
REBECCA R. PALLMEYER
United States District Judge